UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
LUCY DELGADO,

                Plaintiff,

   - against –

UNIVERSAL BEAUTY PRODUCTS, INC,

                Defendant.
--------------------------------------------------------------X

**MEMORANDUM & ORDER**

17-CV-3245 (GRB)(SIL)

FILED
CLERK
2:56 pm, Sep 21, 2022
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**GARY R. BROWN, United States District Judge**:

    Plaintiff, Lucy Delgado, brings this action alleging negligence, strict products liability and breach of warranty, predicated upon a single use of a hair care product manufactured by defendant Universal Beauty Products, Inc., which she claims caused her permanent hair loss.  Plaintiff's case, however, faces an insurmountable hurdle: the complete absence of proof of causation.  Presently before the Court are the parties' cross-motions for summary judgment.  For the reasons that follow, plaintiff's motion is denied, and defendant's motion is granted.

    **Factual Background**

    Defendant Universal Beauty Products, Inc. markets a product known as Robert's Diamond Bond (the "product").  DE 1, at ¶ 14; 56, at ¶ 6.  Robert's Diamond Bond is a gel hair product, which, when applied to the head, dries to form a hard shell[1] allowing the user to glue on hair extensions more safely.  DE 52, at ¶ 6; 56, at ¶ 6.  Hair loss is a known risk of adhesives used to apply hair extensions.  DE 52, at ¶ 26; 56, at ¶ 26.  Robert's Diamond Bond purports to protect the user's natural hair from such adhesives.  DE 56, at ¶ 6.

---

[1] This shell is occlusive, meaning it "create[s] a physical barrier on top of the skin that helps prevent trans-epidermal water."  The Derm Review, *Difference Between Humectant, Emollient, Occlusive* (Aug. 26, 2019), https://thedermreview.com/difference-between-humectant-emollient-occlusive/.  Occlusive barriers are common features of cosmetic products, including moisturizing creams, Vaseline, lip products and hair products. DE 56, at ¶¶ 76, 77.

1

Plaintiff purchased the product from a beauty supply store in Jamaica, Queens, DE 52, at ¶¶ 28, 30, and, on November 1, 2015 applied it to her hair and scalp in her home.[2]  *Id.* at ¶ 18. Plaintiff washed, conditioned and dried her hair, gathered it into a ponytail, and applied the product.  *Id.* at ¶¶ 31-33.  She again used her blow drier to dry the gel, which hardened to a plastic-like shell.  *Id.* at ¶ 34.  After donning a hair net, plaintiff used Lanell Hair glue to attach hair extensions.[3]  *Id.* at ¶¶ 35-36.  After gluing the extensions, plaintiff cut the netting, releasing some of her natural hair.  *Id.* at ¶ 37.[4]

A day later, plaintiff's scalp began to itch, which progressively worsened.  *Id.* at ¶¶ 41, 43. Nevertheless, plaintiff left the product and glue on her head for at least a week and a half.  DE 56, at ¶ 44.  When plaintiff did wash out the product, portions of her hair fell out.  DE 52, at ¶ 45. Plaintiff acknowledges that hair loss from extensions is not uncommon; an experienced hairstylist, she helped remove extensions for clients and assessed the damage to their scalps, including for the possibility of permanent loss.  DE 54-8, at 19.

Nine months after plaintiff used the product and experienced hair loss she was examined by a dermatologist who recommended a shampoo that treats fungal infections and allergic reactions.  DE 52, at ¶¶ 55, 56; 56, at ¶ 55.  Plaintiff did not use the shampoo, nor did she seek any additional medical advice or treatments.  DE 52, at ¶¶ 57-59.  Plaintiff has consistently declined treatment.  DE 54-8, at 147-48.

*Expert Findings*

---

[2] At the time of application plaintiff was 56 years old. DE 54-13, at 2.  Plaintiff is a hair care professional but prior to November 2015 she never used the product on herself or others.  DE 52, at ¶¶ 21, 24; 56, at ¶¶ 21, 24.
[3] Lanell Hair glue includes the following warnings: "This product contains natural rubber latex which may cause allergic reactions in some individuals.  Do not put on scalp. . . . To avoid hair loss, do not pull. To remove, use Lanell Hair Bond remover."  DE 56, at ¶ 97.
[4] Defendant alleges that plaintiff misused and misapplied the product, DE 66, at 7, but, for the purposes of this motion, this Court need not consider this argument.

The remainder of the product purchased by plaintiff was unavailable for testing by the parties' experts.[5] Defendant provided six "batch sheets" reflecting information for manufacturing runs corresponding to the time that plaintiff made her purchase. DE 52, at ¶¶ 12, 13. Each sheet contains the formula, notes concerning the formulation of that particular batch and results of testing, which ensures the component chemicals are within a set range. DE 54-5 at 17.

Plaintiff's expert concedes that there are "no studies that indicate any chemical used in the product can cause permanent hair loss." DE 56, at ¶ 88. In fact, in the deposition of plaintiff's expert, when questioned about whether he has ever observed or is aware of any evidence than any ingredient in the product caused permanent hair loss or cell damage at the concentrations present, he consistently answered "no." DE 54-17, at 117 (pH range); DE 53-18, at 14 (Dowicil 200), 15 (pink sugar), 16 (benzyl benzoate), 17 (vanillin), 18 (propylene glycol), 20 (polyquaternium-7), 21 (arionor ebony, SDA-400), 23 (germaben II), 24 (diazolidinyl urea).[6] In his report, the only potentially relevant opinion evidence offered by plaintiff is the hypothesis that these ingredients, used in combination, could be responsible for plaintiff's alleged hair loss. DE 61-1, at 4; *see also* DE 54-18, at 70. However, as to this opinion, the lynchpin of plaintiff's case, plaintiff's expert conceded at deposition that he has neither conducted, nor can identify, any scientific testing to support such a hypothesis. DE 53-17, at 71. At most, plaintiff's expert supports his conclusions with his "imagination." DE 54-18, at 44. Meanwhile, plaintiff's expert concedes that her alleged

---

[5] Plaintiff sent a package to defendant with a bag of her hair, photographs of her head and of the product. DE 28-5, at 62-64. The hair and photographs were returned to plaintiff's counsel. DE 52, at ¶ 53. Plaintiff alleges she also sent the product to defendant, but defendant has no record of receiving the product. *Id.* at ¶ 50. Because neither plaintiff nor defendant have the product, no testing was done on the substance plaintiff used on November 1, 2015.

[6] While plaintiff's counsel argues two ingredients, Polyvinal Alcohol ("PVA") and Dowicil 200, are listed in the batch sheets at concentrations above the range permitted by the Cosmetic Ingredient Review ("CIR"), plaintiff's expert found those ingredients at the concentrations listed unconcerning. DE 53-18, at 11, 18 (noting that a 13% concentration of PVA, greater than the concentration of PVA in the product, tested under an occlusive barrier was safe for use and presented "no concerns"); *id.* at 13 (noting no knowledge of possible adverse affects of the 0.375% concentration of Dowicil 200 in the product). Further, plaintiff's expert testified that "generally these [CIR] concentrations are based on either a 10- or 100-fold safety margin." DE 53-17, at 126.

3

hair loss may well be attributed to any number of known causes, including hair glues, DE 53-17, at 104, dermatitis, DE 53-18, at 35, fungal infections, stress, iron deficiencies, aging and menopause. *Id.* at 37-8, 45.

The record contains a semantic issue that requires clarification, to wit, whether the accused product or its compents could constitute an irritant, a sensitizer and/or or a cause of "skin corrosion." According to plaintiff's expert, "a sensitizer is specifically an allergic reaction. An irritant is something that can cause, you know, redness of skin as a result of mechanical injury or, you know, an immediate response, whereas a sensitizer is a delayed response."[7] DE 53-18, at 77. Plaintiff's expert describes irritation as any damage, including permanent damage, *id.* at 50, but the technical literature consistently refers to permanent damage as "skin corrosion," which "is the production of irreversible damage to the skin; namely, visible necrosis through the epidermis and into the dermis, following the application of a test substance for up to 4 hours." *See* n. 7. When asked whether the product could be an irritant, plaintiff's expert noted that it "could be an irritant for prolonged use. It is not a strong sensitizer, and it does not corrode skin." DE 53-18, at 50. Further, plaintiff's expert opines that "a product is an irritant if it is not corrosive." *Id.* at 68.

**Procedural History**

Plaintiff commenced this action by filing a complaint on May 30, 2017. *See* DE 1. Defendant answered the complaint on July 19, 2017, DE 6, and the parties proceeded with discovery. The parties filed summary judgment motions on January 7, 2022, DE 66, with plaintiff filing a reply separately on January 14, 2022. DE 68. This decision follows.

---

[7] This explanation is more or less consistent with the Department of Labor's definitions of the terms: "Skin sensitizer means a chemical that will lead to an allergic response following skin contact. . . . Skin irritation is the production of reversible damage to the skin following the application of a test substance for up to 4 hours." United States Department of Labor, Occupational Safety and Health Administration, Appendix A to § 1910.1200 – Health Hazard Criteria, https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.1200AppA.

**Discussion**

*Summary Judgment Standard*

The motions for summary judgment are decided under the oft-repeated and well-understood standard of review for these matters, as discussed in *Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d 198, 211 (E.D.N.Y. 2015), *aff'd*, 643 F. App'x 54 (2d Cir. 2016), which discussion is incorporated by reference herein. "Where, as here, both parties moved for summary judgment, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *Gen. Star Indem. Co. v. Driven Sports, Inc.*, 80 F. Supp. 3d 442, 446 (E.D.N.Y 2015) (quoting *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46, 51 (2d Cir. 2010)). In sum, the question before the Court is whether, based upon the undisputed or improperly disputed facts, the movant is entitled to judgment. It is with this standard in mind that the Court turns to the motions at bar.

*Products Liability*

"[W]hen sitting in diversity cases, federal courts are bound to follow the substantive law of the forum state." *Coleson v. Janssen Pharmaceutical, Inc.*, 251 F. Supp. 3d 716, 719 (S.D.N.Y. 2017) (citing *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994)). Plaintiff's complaint appears to set forth strict products liability claims;[8] negligence claims;[8] and a claim for

---

[8] "Under New York law, a plaintiff's claim based upon an alleged design defect or manufacturing defect sounding in either negligence or strict liability are functionally equivalent and will be analyzed concurrently." *Oden v. Boston Scientific Corp.*, 330 F. Supp. 3d 887, 887 (E.D.N.Y. 2018) (collecting cases). Further, it is well-settled that "[w]here liability is predicated on a failure to warn, New York views negligence and strict liability claims as equivalent." *Id.* (citation and quotation omitted). Design defect claims require that plaintiff "establish: (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) *the design was a substantial factor in causing the plaintiff's injury*." *Coleson v. Janssen Pharmaceutical, Inc.*, 251 F. Supp. 3d 716, 720 (S.D.N.Y. 2017) (test for design defect) (quotation and citation omitted) (emphasis added). "To plead and prove a manufacturing flaw under either negligence or strict liability, the plaintiff must show that a specific product unit was defective as a result of 'some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction,' and that *the defect*

5

breach of implied warranty,[9] all under New York Law.[10] *See generally* DE 1. "In order to adequately plead a claim with regard to any of these [] theories, the plaintiff must show that the product at issue was defective and that the defectively designed *product was the actual and proximate cause of the plaintiff's injury*." *Oden v. Boston Scientific Corp*., 330 F. Supp. 3d 877, 888 (E.D.N.Y. 2018) (citing *Voss v. Black & Decker Mfg. Co*., 450 N.E.2d 204, 207 (N.Y. 1983)) (emphasis added).

> Causation is critical to each claim:
>
> In a product liability case such as these, a plaintiff must prove both general and specific causation as part of his or her *prima facie* case. General causation "bears on whether *the type of injury at issue can be caused or exacerbated* by the defendant's product,' while specific causation addresses 'whether, in the particular instance, the injury *actually was caused or exacerbated* by the defendant's product.' Further, proof of general causation is a necessary predicate for that of specific causation—if there is no evidence that a product is capable of causing the kind of harm claimed, then there is no basis to accept evidence that the product in fact did so in a specific case.

*In re Rezulin Products Liab. Litig*., 441 F. Supp. 2d 567, 575 (S.D.N.Y. 2006); *see also In re Propecia (Finasteride) Product Liability Litigation*, No. 14-cv-0297 (BMC)(PK), 2021 WL 1883869, at *1 (E.D.N.Y. May 11, 2021) ("A products liability plaintiff must prove causation as an element of his claim") (citing *Hamilton v. Beretta U.S.A. Corp*., 96 N.Y.2d 222, 240, 72 N.Y.S.2d 7, 19 (2001)); *Coleson*, 251 F. Supp. 3d at 722 ("[I]n any products liability or personal

---

*was the cause of plaintiff's injury*." *Colon ex rel. Molina v. BIC USA, Inc*., 199 F.Supp.2d 53, 85 (S.D.N.Y. 2001) (quoting *Caprara v. Chrysler Corp*., 417 N.E.2d 545 (1981)) (emphasis added). Pursuant to New York law, to prevail on a failure to warn claim a plaintiff must establish: "(1) the manufacturer has a duty to warn; (2) against dangers resulting from foreseeable uses about which it knew or should have known; and (3) that *failure to do so was the proximate cause of the harm*." *Coleson,* 251 F. Supp. 3d at 720 (quoting *Barrett v. Black & Decker (U.S.) Inc*., No. 06-cv-1970 (SCR)(MDF), 2008 WL 5170200, at *10 (S.D.N.Y. Dec. 9, 2008)) (emphasis added).
[9] Finally, in order for a plaintiff "to plead a claim based upon breach of an implied warranty, the following elements must be alleged: (1) that the product was defectively designed or manufactured; (2) that the defect existed when the manufacturer delivered it to the purchaser or user; and (3) *that the defect was the proximate cause of the injury*." *Oden*, 330 F. Supp. 3d at 895 (citations omitted) (emphasis added).
[10] This reading is further supported by plaintiff's own arguments in her motion for summary judgment. *See generally* DE 66-2.

6

injury action, Plaintiffs must prove causation—that the Defendants' conduct . . . was the proximate cause of Plaintiff's injuries.") (quoting *In re Mirena IUD Prod. Liab. Litig.*, 202 F. Supp. 3d 304, 310 (S.D.N.Y. 2016), *aff'd*, 713 F. App'x 11 (2d Cir. 2017)); *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005) (affirming the district court's grant of summary judgment in favor of defendant on the ground that plaintiff's expert failed to submit competent evidence to show, as a matter of general causation, that the product can cause the alleged harm). "State Law has imposed this requirement because a jury cannot be allowed to speculate as to a chain of causation that turns on the complex interaction between biological process and the drug in question." *In re Propecia*, 2021 WL 1883869, at *1 (citing *In re Mirena*, 202 F. Supp. 3d at 311); *see also In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 387 F. Supp. 3d 323, 336 (S.D.N.Y. 2019), *aff'd*, 982 F.3d 113 (2d Cir. 2020) ("A plaintiff 'may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'") (quoting *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)). "To assure reliable outcomes in a circumstance where the origins of an injury are not obvious or within the scope of a lay juror's everyday experience, and to avoid the risk that juries would equate correlation (the fact that a given plaintiff used a product and developed injuries) with causation, it is imperative that the factfinder be presented evidence that the product was capable of causing the injury of which a plaintiff complains." *In re Mirena (No. II)*, 387 F. Supp. 3d at 339.

"Where a plaintiff cannot adduce proof sufficient to establish an essential element of her claim, there can be no genuine issue of material fact, because a 'complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Id*. at 336 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In opposing a motion for summary judgment, "it is insufficient for [the nonmoving party] merely to

assert a conclusion without supplying supporting arguments or facts." *Gen. Star Indem. Co.*, 80 F. Supp. 3d at 449 (citation and quotation omitted).

After years of unfettered discovery, plaintiff has failed to adduce sufficient evidence to establish causation. Plaintiff's expert failed to put forth any affirmative evidence in his expert reports that the product could cause permanent hair loss, and instead speaks of what he "could imagine." DE 54-18, at 44. Such speculation cannot suffice to sustain plaintiff's burden of proof as to causation; indeed this kind of unsupported expert opinion would be excludable at trial under a *Daubert* analysis. The admissible opinions of plaintiff's expert fundamentally undermine her case: plaintiff's expert concedes that the product is not corrosive, DE 53-18, at 50, and, following review of the additional evidence, concluded that "the raw materials at the usage levels are appropriate based on a paper review." DE 54-18, at 40. With regard to concentration of ingredients, plaintiff's expert noted that neither the concentration of PVA, DE 53-18, at 11, 18, nor the concentration of Dowicil 200 were concerning. *Id.* at 11, 29-31. Further, plaintiff's expert testified that "generally these [CIR] concentrations are based on either a 10- or 100-fold safety margin." DE 53-17, at 125. Finally, plaintiff's expert fails to put forth any evidence to support the notion that the ingredients in the product, used singly or in combination, cause cell death. DE 54-18, at 67. Plaintiff's expert reported that "[a]lthough each individual ingredient and chemical used was evaluated, a formula is a complex mixture of chemicals and ingredients that *could* interact with each other in unexpected ways, even if all the components qualify as 'low risk' based on individual assessments." DE 61-1, at 4 (emphasis added). Yet, plaintiff's expert also testified that a warning label reading "[u]se of the product may result in temporary or permanent hair loss" would not be appropriate because there is no "scientific data on the final formulation to be able to

8

make that claim." DE 54-18, at 52. In sum, plaintiff has failed to put forth sufficient evidence of causation, a fatal defect to all her claims.[11]

Given that plaintiff cannot show general causation, an assessment of specific causation is unnecessary. *In re Mirena IUS (No. II)*, 387 F. Supp. 3d at 340 ("the cause of an individual plaintiff's injuries is properly reached only where a plaintiff can first adduce competent evidence that the product is capable of causing the condition at issue.") (citation omitted). As noted above, "[a] plaintiff may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Id.* at 336.

**CONCLUSION**

Based on the foregoing, defendant's motion for summary judgment, DE 59, is GRANTED and plaintiff's cross motion for summary judgment is denied, DE 61. The Clerk of Court is directed to enter judgment and close the case.

**SO ORDERED.**

Dated: Central Islip, New York
September 21, 2022

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge

---

[11] While "a plaintiff may establish causation in a products liability action through circumstantial evidence . . . this route is only available where a plaintiff cannot identify a specific flaw, and it requires a plaintiff to exclude all other causes for the product's failure that are not attributable to defendants." *Nachimovsky v. Nike, Inc.*, No. 19-cv-2120, 2022 WL 943421, at *6 (E.D.N.Y. Mar. 29, 2022) (quotation and citations omitted). Plaintiff fails both of these requirements. She has alleged a specific defect, namely, the chemical mixture in the product, without proffering admissible evidence which would permit a jury to find that the product was defective. Moreover, she has failed to submit evidence that would exclude all other potential causes for her injury such as the hair glue, dermatitis, fungal infection, stress, iron deficiency, aging or menopause. DE 53-17, at 104; DE 53-18, at 35, 38, 45.